KOOB & MAGOOLAGHAN
Attorneys for Plaintiff
19 Fulton Street, Suit 408
New York, NY 10038
Telephone: (212) 406-3095
Facsimile: (212) 349-4658

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
**MICHAEL SCOTT,**

                Plaintiff,

        -against-                        **COMPLAINT**

**LESTER N. WRIGHT, M.D., M.P.H.,**
Associate Commissioner/Chief Medical Officer,
for the New York State Department of Correctional
Services; **JENNIFER MITCHELL, M.D.,** Facility
Health Services Director, Arthur Kill Correctional
Facility; **JAMSHED TEHRANY, M.D.,** Facility      **JURY TRIAL DEMANDED**
Health Services Director, Arthur Kill Correctional
Facility; **JOHN ALVES, M.D.,** Facility Health
Services Director, Southport Correctional
Facility; and **FRANCOIS THEBAUD, M.D.,**

                Defendants.
-------------------------------------------------------------X

## PRELIMINARY STATEMENT

1. Plaintiff **MICHAEL SCOTT** entered the care and custody of DOCS on or about April 21, 1994. For more than a year prior to his eventual renal cancer diagnosis on or around December 1, 2000, **SCOTT** made repeated complaints regarding blood in his urine (hematuria), coincident with extreme back and kidney pain, to DOCS' medical staff. Despite these complaints, defendants repeatedly failed to conduct proper testing or physical examination of **SCOTT**, and **SCOTT** was denied treatment consistent with good and accepted medical care. By

the time that defendants ultimately diagnosed and treated **SCOTT**'s cancer, his kidney tumor was approximately football-sized, and intimately attached to the surrounding organs. As a consequence of the surgery required to remove a tumor of this size, and as a result of defendants' deliberate indifference to **SCOTT**'s serious medical needs, and defendants's manifest medical incompetence, **SCOTT** was required to undergo complex and life-threatening surgery, suffering chronic renal failure and deep venous thrombosis of the lower extremities. Both of these conditions are potentially life-threatening chronic conditions and will result in serious, life-long harm to **SCOTT**'s health. As a further result of defendants' deliberate indifference and medical incompetence by failing to diagnose and treat his renal cancer, **SCOTT** is now confined to a wheelchair and his remaining kidney may never function normally. **SCOTT** brings this lawsuit under federal law seeking compensation for his injuries.

## JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. This action arises under the Fifth Amendment to the Constitution of the United States; the Eighth Amendment to the Constitution of the United States; the Fourteenth Amendment to the Constitution of the United States; and 42 U.S.C. §1983. Venue is proper in this district under 28 U.S.C. § 1391(b).

## THE PARTIES

3. Plaintiff **MICHAEL SCOTT** is currently incarcerated at Five Points Correctional Facility ("Five Points") and for all relevant time has been under the custody and control of the New York State Department of Correctional Services ("DOCS") either at Five Points, Arthur Kill Correctional Facility ("Arthur Kill"), or Southport Correctional Facility ("Southport").

4. Defendant **LESTER N. WRIGHT, M.D., M.P.H.** is and was at all relevant times

herein the Associate Commissioner and Chief Medical Officer for DOCS and as such he is and was responsible for the supervision and administration of the provision of medical services at the State's correctional facilities.

5. Defendant **JENNIFER MITCHELL, M.D.**, was at some relevant times the Facility Health Services Director at Arthur Kill, and as such, was at some relevant times responsible for supervising and administering the delivery of medical services to **SCOTT**.

6. Defendant **JAMSHED TEHRANY, M.D.**, was at some relevant times the Facility Health Services Director at Arthur Kill, and as such, was at some relevant times responsible for supervising and administering the delivery of medical services to **SCOTT**.

7. Defendant **JOHN ALVES, M.D.**, was at all relevant times the Facility Health Services Director at Southport Correctional Facility, and as such, was at some relevant times responsible supervising and administering for the delivery of medical services to **SCOTT**.

8. Defendant **FRANCOIS THEBAUD, M.D.**, was at all relevant times a physician employed at Arthur Kill. As such, he was responsible for the delivery of medical care to **SCOTT**.

## FACTUAL ALLEGATIONS

9. Plaintiff **SCOTT** entered DOCS custody on or about April 21, 1994, when he was 33 years old and in good health, other than intermittent complaints of back pain.

10. Beginning in 1999, SCOTT's complaints of back pain increased significantly, as reflected by his repeated complaints to medical staff at Arthur Kill. Specifically, upon information and belief, **SCOTT** complained of back pain on or about the following dates: March 30, 1999, April 1, 1999, June 8, 1999, July 20, 1999, August 4, 1999, October 1, 1999, and

October 18, 1999.

11. On or about Sunday, February 6, 2000, while incarcerated at Arthur Kill, **SCOTT** urinated large amounts of blood in his urine, and experienced severe pain in his right kidney. Upon noticing the urine in his blood, **SCOTT** immediately signed up for sick call to obtain medical attention. However, upon information and belief, no doctors were available at the facility on a Sunday, and **SCOTT** was obliged to wait for medical attention until on or about Monday, February 7, 2000.

12. On or about February 7, 2000, **SCOTT** was seen in the Arthur Kill medical clinic by Elaine Rhoades, R.N., to whom **SCOTT** reported that he had urinated blood and was experiencing extreme pain in his right kidney. Nurse Rhoades refused to take a urine sample from **SCOTT** on the ground that **SCOTT**'s episode of hematuria (blood in the urine) had concluded on the previous day and that no urine sample was necessary. Although **SCOTT** requested that he immediately be examined by a physician, Nurse Rhoades refused this request and instructed him to wait his turn to see a physician.

13. On or around February 14, 2000, **SCOTT** was seen by defendant **THEBAUD** in the Arthur Kill medical clinic. **SCOTT** again complained to **THEBAUD** that **SCOTT** had urinated large amounts of blood on February 6, 2000.

14. Upon information and belief, at the time of **SCOTT**'s February 14, 2000 appointment, defendant **THEBAUD** failed to perform a physical exam on **SCOTT**. Upon information and belief, defendant **THEBAUD**'s failure to conduct a physical examination on **SCOTT** was contrary to good and accepted medical practice and was deliberately indifferent to **SCOTT**'s serious medical needs. Instead, defendant **THEBAUD** minimized **SCOTT**'s

4

symptoms, and informed **SCOTT** that any pain in his right kidney area was solely attributable to a pre-existing back condition.

15. Upon information and belief, the only test performed on **SCOTT** as a result of his February 14, 2000 appointment was a urinalysis, in or around March 1, 2000.

16. Upon information and belief, the urinalysis performed on **SCOTT** on March 1, 2000 did not show any microscopic evidence of blood. However, upon information and belief, such a result is not uncommon with kidney cancer, and in light of **SCOTT**'s history of complaints of back pain and hematuria, it was contrary to good and accepted medical practice and deliberately indifferent to plaintiff's serious medical needs to fail to perform further tests on **SCOTT**.

17. Upon information and belief, several tests could have led to the earlier detection of what was ultimately be diagnosed, on or around December 1, 2000, as a cancerous tumor intimately attached to **SCOTT**'s right kidney.

18. Upon information and belief, defendants failed to order or administer adequate tests for **SCOTT** in and around March 2000, or at any time thereafter, until on or around November 16, 2000, by which time **SCOTT**'s tumor had grown to a 16 centimeter (cm) size and was easily palpable.

19. Upon information and belief, despite **SCOTT**'s repeated complaints of back and kidney pain, and contrary to good and accepted medical practice, defendant **THEBAUD** and Nurse Rhoades failed to ever perform a physical examination on **SCOTT** until August 2000.

20. On or about August 20, 2000, **SCOTT** again discovered that he was urinating large amounts of blood and experiencing extreme pain in his right kidney area.

21. On or about August 21, 2000, **SCOTT** again reported to Arthur Kill medical clinic,

5

where he was seen by Nurse Administrator Albert Adekanmi. **SCOTT** informed Adekanmi that this was the second occurrence of blood in his urine accompanied by severe pain to his right kidney area.

22. On or about August 21, 2000, **SCOTT** was again seen by defendant **THEBAUD**, and **SCOTT** again complained to **THEBAUD** about hematuria and severe right kidney pain.

23. Upon information and belief, defendant **THEBAUD** failed to conduct an adequate physical examination of **SCOTT** in August 2000.

24. On or about August 21, 2000, defendant **THEBAUD** prescribed **SCOTT** medication for a urinary tract infection, and defendant **THEBAUD** ordered x-rays and a urine sample. However, upon information and belief, the urine sample was not collected from **SCOTT** until two days after his appointment with defendant **THEBAUD**, by which time **SCOTT** had ceased to urinate blood.

25. On or about August 31, 2000, **SCOTT** received a memorandum from Arthur Kill medical clinic informing him that x-rays taken of his abdomen and kidney area on or around August 21, 2000 were normal.

26. Upon information and belief, x-rays taken of **SCOTT**'s abdomen and kidney area on or about August 21, 2000, indicated that an artifact could be seen overlaying **SCOTT**'s kidney on two images. Upon information and belief, despite the presence of an artifact on the August 21 x-ray, **SCOTT** did not receive a repeat x-ray.

27. Instead, on or about September 1, 2000, **SCOTT** was transferred to Southport Correctional Facility.

28. Upon information and belief, upon **SCOTT**'s transfer from Arthur Kill to Southport

6

on or around September 1, 2001, and despite defendant **THEBAUD's** failure to determine the cause of **SCOTT's** symptoms, defendants **MITCHELL, TEHRANY, ALVES,** and **THEBAUD** failed to institute any program or procedures to provide for follow-up care regarding **SCOTT's** ongoing complaints of hematuria and severe back and kidney pain.

29. Upon information and belief, between August and November 10, 2000, although defendants **MITCHELL, TEHRANY, ALVES,** and **THEBAUD** knew or should have known that no cause was ever determined for **SCOTT's** symptoms, defendants failed to conduct or arrange either a physical exam or additional testing to determine the source of **SCOTT's** ongoing pain and hematuria.

30. Defendants **MITCHELL, TEHRANY, ALVES,** and **THEBAUD's** failure to arrange for follow-up care of **SCOTT** after he was transferred to Southport and their failure to determine the cause of **SCOTT's** continued complaints of back pain, kidney pain, and hematuria was contrary to good and accepted medical practice and deliberately indifferent to **SCOTT's** serious medical condition.

31. On or about November 10, 2000, **SCOTT** again urinated large amounts of blood.

32. On or about November 10, 2000, **SCOTT** was examined at the Southport medical clinic and transferred to St. Joseph's Hospital Emergency Room, where he was informed that results of a CAT scan showed that **SCOTT** had a "cyst" on his right kidney.

33. On or about November 16, 2000, **SCOTT** had a contrast CAT scan performed at St. Joseph's Hospital.  **SCOTT** was subsequently informed, on a date unknown, that the scan showed he had a "cyst" on his kidney that had now grown to 16 cm (more than 6 inches) in size.

34. On or about November 21, 2000, **SCOTT** was admitted to the Southport infirmary

7

because of severe pain to the right side of his body, and **SCOTT** was discharged back to his cell the next day, November 22, 2000.

35. On or about November 27, 2000, **SCOTT** was transported to St. Joseph's Hospital, where a bone scan was taken of his entire body.

36. On or about November 29, 2000, a contrast CAT scan was performed on **SCOTT**'s abdomen and kidneys.

37. On or about December 1, 2000, **SCOTT** met with Dr. Gabriel P. Haas at the Walsh Regional Medical Unit's clinic. Dr. Haas reviewed tests and findings with **SCOTT**, and informed **SCOTT** that he had renal cancer and required surgery to save his life.

38. On or about December 20, 2000, Dr. Haas operated on **SCOTT** at the SUNY Upstate Medical Center. Upon information and belief, in order to remove the approximately football-sized cancerous tumor, **SCOTT** underwent complex and life-threatening surgery.

39. Upon information and belief, at the time of Dr. Haas's operation, **SCOTT**'s tumor was intimately attached to his vena cava, duodenum, and small intestines. Upon information and belief, due to its size, the tumor could only be removed at the price of extensive vascular reconstruction and bowel surgery.

40. Upon information and belief, when **SCOTT**'s tumor was discovered in November 2000, the tumor was easily palpable and approximately football-sized. Upon information and belief, a tumor of this size would have been present and discernible for a prior period of more than a year prior to November 2000, and possibly years.

41. Upon information and belief, as a consequence of the unusually complex surgery required to remove a tumor of this size, **SCOTT** sustained chronic renal failure and deep venous

8

thrombosis of the lower extremities, both of which are chronic medical conditions and likely to result in serious long-term detriment to **SCOTT**'s life and health.

42. As a consequence of the extensive December 20 surgery, **SCOTT** must now at all times use a wheelchair for mobility.

43. Upon information and belief, defendant **THEBAUD**'s failure to conduct a physical examination prior to August 2000, and ongoing failure to investigate **SCOTT**'s repeated complaints of pain, was a clear deviation from accepted standards of medical practice and deliberately indifferent to **SCOTT**'s serious medical needs.

44. Upon information and belief, defendant **THEBAUD**'s failure to conduct additional testing upon **SCOTT** after he complained of blood in his urine in February 2000 was a clear deviation from accepted standards of medical practice and deliberately indifferent to **SCOTT**'s serious medical needs.

45. Upon information and belief, as a direct and proximate result of defendant **THEBAUD**'s failure to diagnose and treat **SCOTT**'s renal cancer, the removal of **SCOTT**'s tumor was much more difficult because by the time of diagnosis, the tumor involved **SCOTT**'s vena cava, duodenum and small bowel.

46. Upon information and belief, **SCOTT**'s outcome and prognosis was materially affected by the delay in diagnosis. **SCOTT**'s postoperative recovery took nearly two months and his remaining kidney may never function normally.

47. Upon information and belief, if defendant **THEBAUD** had performed a proper examination and testing upon **SCOTT** at any earlier date, the presence of an abdominal mass would have been detected at an earlier time, and **SCOTT**'s condition could have been diagnosed

9

before the tumor attached to nearby organs.

48. Upon information and belief, earlier diagnosis and treatment would have significantly reduced and/or eliminated the complications of **SCOTT**'s surgery and the resulting serious life-long health problems from which **SCOTT** now suffers, including the fact that **SCOTT** must use a wheelchair for mobility.

49. Upon information and belief, it is consistent with good and accepted medical practice to evaluate an individual who repeatedly presents with recurring back, kidney pain, and hematuria for a possible diagnosis of renal cancer. Despite this fact, defendant **THEBAUD** repeatedly and callously ignored **SCOTT**'s repeated complaints of these symptoms.

50. Defendant **THEBAUD** willfully and maliciously failed and refused to provide adequate medical care to **SCOTT**, contrary to good and accepted medical practice. Upon information and belief, said deficiencies in the provision of adequate medical care include but are not limited to the following: failure to timely diagnose **SCOTT**'s renal cancer; failure to investigate **SCOTT**'s repeated complaints of severe back and kidney pain and hematuria; failure to conduct the appropriate additional testing on **SCOTT**, in or around March 2000, or at any time thereafter, to determine the cause of **SCOTT**"s hematuria and severe back and kidney pain; failure to conduct a physical exam on **SCOTT** at any time prior to August 2000; and failure to conduct an adequate physical exam upon **SCOTT** in August 2000.

51. At all relevant times, defendants **WRIGHT, MITCHELL, TEHRANY,** and **ALVES** were responsible for the delivery and coordination of health care and treatment to prisoners like **SCOTT** who repeatedly present at facility health clinics with symptoms indicative of serious illness.

10

52. Defendants **WRIGHT, MITCHELL, TEHRANY**, and **ALVES** willfully and maliciously failed to coordinate **SCOTT's** medical care between February 2000 and November 2000; failed to arrange for proper continuing care of **SCOTT** upon his transfer from Arthur Kill to Southport on or about September 1, 2000; inadequately hired, trained, and/or supervised medical staff; hired unqualified and/or untrained medical staff; failed to maintain complete patient medical records; and engaged in gross negligence in supervising subordinates who provided deficient medical care to **SCOTT**.

53. Defendants **WRIGHT, MITCHELL, TEHRANY**, and **ALVES** failed to exercise due care in the selection, training and supervision of competent medical care, and failed to promulgate and enforce proper procedures and regulations regarding physical examinations, performance of appropriate testing upon patients, and follow-up care for at-risk patients between clinic visits and after a patient's transfer to a new facility.

54. Upon information and belief, defendants **WRIGHT, MITCHELL, TEHRANY**, and **ALVES** developed and implemented a system of health care whereby no continuity of care or follow-up was provided to patients, like **SCOTT**, who repeatedly present at facility health clinics with symptoms indicative of serious illness. Said policy foreseeably results in a denial of adequate medical care to patients like **SCOTT**, particularly when such patients are transferred between facilities without the provision of follow-up investigation of or adequate continuous care. Defendants **WRIGHT, MITCHELL, TEHRANY**, and **ALVES** knew or should have known that said policy results in the completely inadequate provision of medical care and treatment to patients who require ongoing health care, creating a foreseeable risk of serious harm to such prisoners.

11

55. Defendants **WRIGHT, MITCHELL, TEHRANY, ALVES,** and **THEBAUD,** acting under color of state law, by their actions and/or omissions, willfully and maliciously demonstrated deliberate indifference to plaintiff's life and safety and/or serious medical needs.

56. Defendants **WRIGHT, MITCHELL, TEHRANY, ALVES,** and **THEBAUD,** acting under color of state law, by their actions and/or omissions, willfully and maliciously denied plaintiff life, liberty, and/or property without due process of law.

57. Defendants **WRIGHT, MITCHELL, TEHRANY, ALVES,** and **THEBAUD** each knew or should have known of the deficiencies alleged herein which were within his/her jurisdiction.

58. Defendants **WRIGHT, MITCHELL, TEHRANY, ALVES,** and **THEBAUD** each knew or should have known that there was a foreseeable risk of serious harm as a result of the deficiencies alleged herein.

59. That the acts and omissions of defendants **WRIGHT, MITCHELL, TEHRANY, ALVES,** and **THEBAUD** constituted continuing violations of **SCOTT**'s civil rights from on or about February 2000 to on or about December 2000.

60. Defendants **WRIGHT, MITCHELL, TEHRANY, ALVES,** and **THEBAUD** owe and owed a duty of care to **SCOTT**, an incarcerated citizen, to provide adequate medical care and treatment, which includes the coordination of such medical care between correctional facilities.

61. That, as a result of defendants **WRIGHT, MITCHELL, TEHRANY, ALVES,** and **THEBAUD**'s mistreatment, plaintiff **SCOTT** experienced extreme pain and suffering, emotional distress, and currently suffers permanent injury.

62. That plaintiff **SCOTT** has exhausted his administrative remedies, to the extent they

were available to him.

### FIRST CLAIM (Deliberate Indifference)

63. Plaintiff repeats and realleges as if fully set forth herein the allegations contained in paragraphs numbered 1 through 61.

64. Defendant **THEBAUD**'s failure to provide plaintiff **MICHAEL SCOTT** with adequate medical care during his period of confinement at Arthur Kill and Southport demonstrated deliberate indifference and/or willful neglect to plaintiff's serious medical needs constituting cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution.

65. As a result of defendant **THEBAUD**'s violation of plaintiff's constitutional rights, plaintiff has suffered severe pain and suffering, including unnecessary pain and discomfort, a deterioration of her medical condition, loss of limb, loss of future earnings, permanent disability and mental distress, and accordingly plaintiff is entitled to compensatory damages against defendants, jointly and severally in the amount of $30,000,000.00 and punitive damages against each defendant in the amount of $15,000,000.00.

### SECOND CLAIM (Due Process)

66. Plaintiff repeats and realleges as if fully set forth herein the allegations contained in paragraphs numbered 1 through 61.

67. Defendant **THEBAUD**'s failure to provide plaintiff **MICHAEL SCOTT** with adequate medical care during his period of confinement at Arthur Kill and Southport Correctional Facility deprived plaintiff of life, liberty and/or property without due process of law in violation of the Fifth and Fourteenth Amendments of the United States Constitution.

68. As a result of defendant **THEBAUD**'s violation of plaintiff's constitutional rights, plaintiff has suffered severe pain and suffering, including unnecessary pain and discomfort, a deterioration of his medical condition, loss of limb, loss of future earnings, permanent disability and mental distress, and accordingly plaintiff is entitled to compensatory damages against defendants jointly and severally in the amount of $30,000,000.00 and punitive damages against each defendant in the amount of $15,000,000.00.

### THIRD CLAIM (Deliberate Indifference)

69. Plaintiff repeats and realleges as if fully set forth herein the allegations contained in paragraphs numbered 1 through 65.

70. Defendants **WRIGHT**, **MITCHELL**, **TEHRANY**, and **ALVES** developed and implemented a system of health care whereby no continuity of care or follow-up was provided to patients, like **SCOTT**, who repeatedly present at facility health clinics with symptoms indicative of serious illness. By their actions, Defendants **WRIGHT**, **MITCHELL**, **TEHRANY**, and **ALVES** demonstrated deliberate indifference and wilful neglect to plaintiff's serious medical needs constituting cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution.

71. As a result of Defendants **WRIGHT**, **MITCHELL**, **TEHRANY**, and **ALVES**' violation of plaintiff's constitutional rights, plaintiff has suffered severe pain and suffering, including unnecessary pain and discomfort, a deterioration of his medical condition, loss of limb, loss of future earnings, permanent disability and mental distress, and accordingly plaintiff is entitled to compensatory damages against defendants jointly and severally in the amount of $30,000,000.00 and punitive damages against each defendant in the amount of $15,000,000.00.

## FOURTH CLAIM (Due Process)

72. Plaintiff repeats and realleges as if fully set forth herein the allegations contained in paragraphs numbered 1 through 65.

73. Defendants **WRIGHT**, **MITCHELL**, **TEHRANY**, and **ALVES** developed and implemented a system of health care whereby no continuity of care or follow-up was provided to patients, like **SCOTT**, who repeatedly present at facility health clinics with symptoms indicative of serious illness. By their actions, defendants **WRIGHT**, **MITCHELL**, **TEHRANY**, and **ALVES** deprived **SCOTT** of property and liberty without due process of law in violation of the Fifth and Fourteenth Amendments of the United States Constitution.

74. As a result of defendants **WRIGHT**, **MITCHELL**, **TEHRANY**, and **ALVES'** violation of plaintiff's constitutional rights, plaintiff has suffered severe pain and suffering, including unnecessary pain and discomfort, a deterioration of his medical condition, loss of limb, loss of future earnings, permanent disability and mental distress, and accordingly plaintiff is entitled to compensatory damages against defendants jointly and severally in the amount of $30,000,000.00 and punitive damages against each defendant in the amount of $15,000,000.00.

## JURY TRIAL DEMANDED

**WHEREFORE**, plaintiff respectfully requests that this Court enter an Order granting plaintiff $30,000,000.00 on the first cause of action, $30,000,000.00 on the second cause of action, $30,000,000.00 on the third cause of action, and $30,000,000.00 on the fourth cause of action; granting plaintiff punitive damages against all defendants individually in the amount of $15,000,000.00; granting plaintiff reasonable attorneys' fees, costs and disbursements pursuant to the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. §1988; and granting such other

15

and further relief as to this Court may seem just and proper.

Dated: August 19, 2003
      New York, New York

                              **KOOB & MAGOOLAGHAN**
                              Attorneys for Plaintiff
                              By:

                              Alexander A. Reinert (AR-1740)
                              19 Fulton Street, Suite 408
                              New York, New York 10038
                              Tel.: (212) 406-3095